12786

McCUTCHEN v. PACIFIC MUT. LIFE INS. CO.

(151 S. E., 67)

402

404

406

410

412

414

418

420

424

426

428

Messrs. *Thomas & Lumpkin* and *C. B. Ruffin,* for appellant

Messrs. *Tatum & Jennings* and *Mendel L. Smith,* for respondent

Dec. 13, 1929.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

Not being able to agree in this case with the views of Mr. Justice Cothran, and the conclusion he wishes the Court to adopt, I propose, as briefly as I can, to give expression to my reasons for favoring an affirmance of the judgment below.

We adopt in the main the "statement," made up by the defendant-appellant, and consented to by the plaintiff-respondent. It is as follows:

On March 17, 1924, the defendant, Pacific Mutual Life Insurance Company, issued and delivered to the plaintiff a certain policy of life insurance for the face amount of $5,-

000. There was incorporated in this policy a clause by which the company agreed to waive the premiums and to pay to the insured certain monthly benefits of $75 each if, before the age of 60 and while the policy was in force, the insured became permanently and totally disabled as defined in the policy.

Plaintiff became totally deaf between the 10th and 15th of June, 1927, and filed claims for disability benefits the following September.

The defendant company refused to honor the claim on the ground that the plaintiff was not so disabled by his deafness as to prevent him from performing any work or engaging in any occupation or profession for wages, compensation, or profit.

The plaintiff brought this action in the Court of Common pleas for Lee County to recover the twelve monthly payments of $75 each alleged to be due and for the return of a premium of $234.80 paid under protest during pendency, of the alleged disability. The matter came on to be heard before his Honor, R. W. McLendon, Special Judge, and a jury at the summer term of 1928.

At the conclusion of the plaintiff's testimony, defendant moved for a nonsuit on the grounds that the testimony clearly established that plaintiff was then and had been able to perform some work and to engage in some occupation or profession for wages, compensation, or profit. The presiding Judge overruled this motion and likewise overruled a motion for a directed verdict in behalf of the defendant upon substantially the same grounds.

The jury was instructed that the disability payments, if any, commenced to become due immediately upon receipt of due written proof of such disability, which was admitted to be September, 1927.

The jury returned a verdict in favor of the plaintiff in the sum of $935.51.

The provisions of the policy upon which the defendant based its defense, and which we are to consider in the determination of the appeal, are as follows:

"Should the insured, before the anniversary of this policy nearest the date on which he shall attain the age of sixty years and while this policy is in full force and no premium thereon in default, become permanently totally disabled, as hereinafter defined, the company, subject to the conditions hereinafter set forth, will waive the payment of all future premiums required under the conditions of the policy as they become due and pay the insured a monthly income of $75.00, such waiver to be effective and the first of such monthly income payments to become due and the period of liability to commence as of the date of receipt at the home office of the company of due written proof of such disability and a subsequent payment to be made on the first day of each month thereafter during the continuance of such disability. Such waiver of premiums and income payments shall not affect any other benefits or values provided under the policy.

"Permanent total disability, as used herein, is defined to mean:

"(1) Disability caused by accidental bodily injury or disease which totally and permanently prevents the insured from performing any work or engaging in any occupation or profession for wages, compensation or profit; or

"(2) Disability caused by accidental bodily injury or disease which totally prevents the insured from performing any work or engaging in any occupation or profession for wages, compensation or profit and which shall have totally and continuously so prevented the insured for not less than ninety days immediately preceding the date of receipt of due written proof thereof; or

"(3) The irrecoverable loss of the entire sight of both eyes, or the amputation at or above the wrist or ankle of

both hands or both feet or a hand and foot, if such loss or amputation is caused by accidental bodily injury or disease."

From the verdict of the jury, and the judgment thereupon entered, the defendant, insurance company, has appealed on five exceptions, which, with the charge of the Court, will be reported. These impute error to the presiding Judge for his refusal to grant a motion of nonsuit, his failure to direct a verdict for the defendant, his declination to charge certain requests made by the defendant, and the giving of instructions presented by the plaintiff. The counsel for the appellant very properly have said that all the exceptions are interrelated, and assign practically the same errors; and, accordingly, they have discussed them together in their argument. In our disposition of the exceptions, we shall follow that excellent example.

The rulings made by the trial Judge were based upon the decisions of this Court in three cases. *Brown v. Missouri State Life,* 136 S. C., 90, 134 S. E., 224; *Berry v. United Life & Accident Insurance Company,* 120 S. C., 328, 113 S. E., 141, and *Taylor v. Southern States Life,* 106 S. C., 356, 91 S. E., 326, L. R. A., 1917-C, 910. The respondent depends mainly upon those cases to support the judgment in his favor. The appellant contends, and Mr. Justice Cothran, in his proposed opinion, agrees with that contention, and has practically adopted the argument in its favor, that the cases cited are not applicable to the case at bar, and it is sought to distinguish this case from the principles announced in the mentioned cases.

The attorneys for the appellant and the respondent have both presented exceptionally able arguments in support of their respective positions, and have been a great assistance to the members of the Court in passing upon the questions to be determined and the prepration of opinions. As we see it, the appellant depends almost entirely upon decisions from jurisdictions other than our own to support its side of the case. On the other hand, the respondent confines his argu-

ment mainly to showing by our own cases that the rulings of the Court below were correct. It would take much unnecessary time for us to improve, if we could improve at, all upon the manner in which the respondent's counsel have presented the questions to be determined by the Court, and, for that reason, we have liberally quoted from their argument in our opinion.

The exceptions present the sole question of a proper determination of what constitutes a *permanent total disability* in an insurance policy of the kind under consideration. When this question is determined, the standard will be provided which may be easily applied to the rulings and conclusions of the presiding Judge, in the particulars assailed, and which will determine the correctness thereof.

The contention of the appellant is that, in order to constitute such a disability, it is incumbent on the insured to establish such a present, continuing, and permanent disability as a result of accidental bodily injury or disease, as will permanently, continuously, and *wholly* prevent the insured from performing any work, or engaging in any occupation, avocation, or profession for wages, compensation, remuneration, or profit, or from engaging in any gainful occupation, even though he should be so disabled as to prevent him from following that accustomed trade or business for which he has been trained and equipped.

The appellant's requests to charge were so constructed as to embody this view of the law which the presiding Judge should adopt as a proper instruction to the jury.

The respondent contended that a permanent total disability in this policy did not mean a condition of absolute helplessness which results only from a loss of reason, but an inability to do substantially all the material acts necessary to the conduct or prosecution of the business or occupation of the insured in substantially his usual and customary manner; that if, in the prosecution of his business, he was to do several acts and perform several kinds

of labor, and he is thereby incapacitated to do and perform only one of such acts; he would be as effectually disabled from performing his business as if he were unable to do anything required to be done, if, while remaining in that condition, he suffers loss of time in the business or his occupation; that the words "total disability" as used in the policy do not contemplate an absolute physical disability to transact any kind of business relating to one's occupation, but it is sufficient, if his injuries are such that common care and prudence require him to desist from transacting any such business, in order to effect a cure, or in order to prevent his business from becoming unprofitable; and that the insured is deemed "totally disabled" when he is no longer able to do his customary tasks and such work as he has only been trained to do and upon which he must depend for a living.

These last-mentioned views were embodied in the requests to charge of the respondent, and were substantially adopted and charged by the presiding Judge as a proper interpretation of such clauses.

We will consider, first, the question as to whether the instructions based upon the adopted interpretation of these clauses was erroneous.

In the case of *Taylor v. Insurance Company,* 106 S. C., 356, 91 S. E., 326, 327, L. R. A., 1917-C, 910, the Court held that in such contracts one is "deemed totally disabled when he is no longer able to do his accustomed task, and such work as he has only been trained to do, and upon which he must depend for a living."

In the case of *Berry v. Insurance Company,* 120 S. C., 328, 113 S. E., 141, 142, which was the next case considered, the Court quotes with approval the above language from the *Taylor case,* and adds the following language from 7 Ann. Cas., 815, in support of its conclusions: "The rule prevailing in most jurisdictions is that the 'total disability' contemplated by an accident insurance policy does not mean,

as its literal construction would require, a state of absolute helplessness which can result only from loss of reason, since as long as one is in full possession of his mental faculties he is capable of transacting some part of his business, whatever it may be, although he is incapable of physical action. On the contrary, these Courts, giving consideration to the object of the contract, hold that the 'total disability' contemplated by the agreement is inability to do substantially all of the material acts necessary to the prosecution of the insured's business or occupation, in substantially his customary and usual manner."

In the next case of *Brown v. Insurance Company,* 136 S. C., 90, 134 S. E., 224, 225, the Court again sanctions the principle of construction declared in the extracts set out above from the *Taylor* and *Berry cases,* and further emphasizes its approval and adherence to the announced doctrine by an additional quotation from 14 R. C. L., 1316, as follows: "If the prosecution of the business required the insured to do several acts and perform several kinds of labor, and he is able to do and perform one only, he is as effectually disabled from performing his business as if he were unable to do anything required to be done, and while remaining in that condition he suffers loss of time in the business of his occupation. Nor does the provision contemplate absolute physical disability to transact any kind of business pertaining to one's occupation, but it is sufficient if his injuries are such that common care and prudence require him to desist from transacting any such business in order to effect a cure."

The appellant attempts to draw some shadowy distinction in the argument submitted, between what is termed an "accident policy" and one of the character in question, and seeks to avoid the direct and controlling effect of one, at least, of these cases as wholly antagonistic to its contention by referring it to the former class.

The disability contemplated in the policy in the present case, as it was in the *Brown case, supra,* and presumably the

*Taylor case, supra,* was such as may be caused by *"bodily injury"* as well as *disease,* resulting in permanent total disability.

The contention based on such distinction leads to the wholly illogical and untenable position that principles determinative of a permanent total disability as contemplated in a policy providing only for an *accidental* source of disability or incapacity, are inapplicable to a policy whose provisions add to this particular source of injury another disability originating from disease. No authority has been furnished to sustain any such distinction, nor is in accord with the plainest dictates of reason or common sense.

In the *Taylor case,* the clause under consideration was: "If the insured shall furnish to the company due proof that he has become physically disabled, and wholly, continuously, and permanently incapacitated from carrying on any gainful occupation, then in such case, immediately on such proof as aforesaid being furnished to the company, the policy shall ·mature as an endowment to the extent of one-fourth of the amount insured hereunder, which shall thereupon be paid in cash to the insured, in part payment of the amount insured hereunder."

In the *Brown case,* the clause under consideration was: "If the said insured shall become totally and permanently disabled before attaining the age of sixty  *  *  *  the total and permanent disability referred to herein may be due either to bodily injuries or disease occurring and originating while this contract is in full force  *  *  *  and must be such as to prevent the insured from engaging in any gainful occupation."

We think to hold that principles, applicable to the construction of such clauses as these, would be inapplicable to the clause now under consideration, for the reasons urged, would fall little short of a reproach upon the law.

It is therefore perfectly obvious that the respondent's requests to charge, in the particulars in which they are here

questioned, were in absolute harmony with the repeated utterances of the Court, should have been charged, and the requests of appellant should have been refused, as they were clearly not in accord therewith.

Both the appellant and Mr. Justice Cothran have called our attention to a number of decisions from jurisdictions other than our own in support of the claim that the trial Judge was in error as to his conclusions as to the law involved in the case. The decisions of these other jurisdictions cannot, and should not, have any effect with our Court, when practically the identical questions have already been determined by our own decisions. In the recent case of *State ex rel. Richards v. Moorer et al.*, 150 S. E., 269, Mr. Justice Stabler, speaking for the Court *en banc,* said, in effect, that without urgent reasons or clear manifestation of error this Court should not abandon a doctrine or principle declared to be sound and the law of this jurisdiction, and substitute therefor the decisions of the Courts of other jurisdictions. With that view another associate justice and eleven Circuit Judges announced themselves in thorough accord. Three of the justices of this Court and three Circuit Judges did not agree with all the conclusions of Mr. Justice Stabler in the opinion there written by him, but there was no indication that any one of these dissented from the view referred to. It seems clear, therefore, that the holding announced by Mr. Justice Stabler had the approval of the Court *en banc,* consisting of the five justices of the Supreme Court and the fourteen Circuit Judges.

We have not examined the hundreds of cases from other jurisdictions, which bear in some way, directly or remotely, upon the main point in issue here. We have read, however, quite a number of these decisions. It is not necessary to attempt any kind of a review of them. They are full of inconsistencies, antagonisms, and contrarieties. No human being could reconcile them. We apprehend that the main reason for this great divergence of opinion is due to the fact

that many judges of appellate Courts have endeavored to substitute their own opinions for the opinions of the jurors who tried the cases. Perhaps some of these Judges did right, in those jurisdictions which do not happen to have the high regard for the verdicts of juries which this Court has held for more than a hundred years. Out of all this maze of ur certainty and confusion, we have found boldly standing forth in its majesty of reason and justice one well-announced principle, which is in entire harmony with the decisions of our own Court. The principle to which we refer is well expressed in the general text of Corpus Juris as follows: "The Courts have not given any general definition of the words 'total disability,' and what amounts to a total disability is a relative matter, and depends largely upon the circumstances of each case, and upon the occupation and employment in which the person insured is engaged." 1 C. J., 462. To the same effect, see 14 R. C. L., 1315.

Mr. Justice Cothran is of the opinion that a very strong expression of Mr. Justice Gage, who wrote the opinion in the *Taylor case, supra,* was not called for by the facts of the case, and that the expression was clearly erroneous. The language referred to is this: " * * * He is deemed totally disabled when he is no longer able to do his accustomed task and such work as he has only been trained to do and upon which he must depend for a living." We are willing to concede that the same result would have been attained in the *Taylor case* without the insertion of the language which our distinguished brother is disposed to think should have been left out. The fact remains that Mr. Justice Gage used the language. We can rest assured, if that distinguished jurist had not thought it proper for him to write those words, he would not have written them. It is fair, too, for us to assume that Justices Hydrick, Fraser, and Watts, who concurred in the opinion of Mr. Justice Gage, found no fault with either the idea sought to be expressed or the language in which it was clothed. It has been recog-

nized and followed in the Courts of this state for thirteen years.

Mr. Justice Cothran reminds us that many blind or deaf people, and some who have suffered the loss of a limb, have yet been able to hold high positions of honor and trust, and have engaged in lucrative avocations. He has especially called attention to a remarkable Confederate soldier and the wonderful Helen Keller. The trouble with the argument he advances along this line is that it is based upon the abilities and doings of exceptional men and women. The world is not made up of these exceptional people, and the law does not take them into much consideration in setting up its standard. We must deal with the ordinary people, the average of men and women. To follow to a last possible analysis the argument of the appellant in this case, supported by our learned brother, would result in making it almost humanly impossible for an insured in a policy like the one involved in this case to ever collect benefits because of "total disability." If a justice of this Court, insured by one of these policies, should become entirely deaf, he, of course, could not continue to perform the duties of his office; and perhaps he could not even find it possible to make a living in the practice of the law, his former profession. He might eke out a bare living by sitting at the door of the Supreme Court chamber, selling lead pencils to the members of the bar, who, with the milk of human kindness in their hearts, might become purchasers. The earning of a living in that manner would defeat his claim for "total disability" under the argument so strenuously advanced.

The remaining question is whether the presiding ■■ Judge was in error in overruling the motions for a nonsuit and directed verdict.

It is too well established in this state to require any discussion that in motions of this character all the testimony, and the reasonable inferences deducible therefrom, are to

be taken most favorably to the party against whom the motion is directed.

Again, it is not the function of the Court in such cases to weigh the testimony, but simply to determine if there is any relevant and competent testimony adduced reasonably tending to establish the material elements in the plaintiff's cause of action. As well and concisely stated by the Court in the case of *State v. Villepigue,* 127 S. C., 393, 121 S. E., 258, 259, in such motions, "It is for the Judge to determine the *existence* of such evidence; the *effect* or *force* thereof is for the jury." (Emphasis added.)

The following language used by the trial Judge in the *Taylor case* was approved by the Court: "I think the case will have to go to the jury. I think every case will have to stand on its own bottom as to disability. I am almost prepared to say that what might be disability to one person might not be to another. For example, leaving out the special case mentioned in the policy, take a lawyer that loses both of his legs; he could still pursue his vocation; but if he was a farmer or a carpenter he could not. So it depends entirely on the individual, I think, and that, of course, would be a matter for the jury."

And there said Mr. Justice Gage: "It would be like squaring the circle for a Judge to undertake to say just at what juncture a *part* became a *whole,* at what period a disability is enlarged from *partial to total.*" (Emphasis added.)

In the recent case of *Levan v. Insurance Company,* 138 S. C., 253, 136 S. E., 304, 307, the Court declared: "Coming to the case at bar, it was for the jury to say whether or not Levan was totally and permanently disabled as defined in the policy, and at the time the premium came due, by reason of this disability, whether he was incapable of furnishing proof, and whether the beneficiary gave notice with reasonable promptness under all the circumstances."

Applying these elementary and often sanctioned principles, and assuming that the trial Judge was correct in his interpretation of the clauses involved, as we

have held, the final inquiry is whether there is any competent evidence in this case reasonably tending to show that the respondent was suffering from a permanent and total disability under the policy, by reason of an absolute and permanent deafness, and this question involves a brief consideration of the testimony in the cause. There was testimony offered tending to establish substantially the following facts:

The policy in question was issued to the respondent on the 17th day of March, 1924. This policy contained the clauses which have already been set out. The respondent became totally and permanently deaf about the middle of June, 1927, and filed his claim for monthly indemnity in the following September, which payment was refused. He thereafter paid the annual premium for 1928, under *protest* and without waiving any of his accrued rights under the policy.

The respondent was a married man with a wife and two young children, and lived in the Town of Bishopville. He finished the course of study in the Bishopville common and high schools, graduated at the South Carolina College, now the University of South Carolina, in 1903, and in the fall of the same year finished a three months' course in business and banking at the Eastman Business College at Poughkeepsie, N. Y.

During the years 1904 and 1905 he was employed as assistant cashier of the People's Bank, Bishopville, S. C. He then went to his father's place in 1906 and farmed from this time through the year 1912. In the fall of 1912, or the year 1913, he formed, and became general manager of, a mercantile corporation known as the Woodward-McCutchen Company, authorized to engage in a general supply busicording to custom, was conducted on the public streets of the Town of Bishopville. In the fall of 1925, he purchased the stock of this concern and operated the same until his

incapacity in June, 1927. This business was finally closed out in the usual course about the 1st of January, 1928.

As the manager and owner of this business, he had to pass on credits, constantly confer with customers and those who sought credit advances, secure information concerning the nature and value of proffered securities, keep posted on the progress and condition of growing crops and many other matters necessarily incident to an intelligent management of such business.

The respondent had not farmed in about ten years at the time of his incapacity, but during the years of 1926, 1927, and 1928 his brother operated a farm for them individually, for which the brother received a salary and under an agreement was entitled to an equal division of crops, but the testimony shows that during the last year the farm was operated at a substantial loss, and furnished but little profit the previous years.

The respondent had not kept any books for ten or fifteen years, and testified that in his present condition he did not believe that he could keep books satisfactorily.

He further testified that he bought cotton in accordance with the custom on the public streets, but ascertained after his disability that he could not prosecute this work, and was even forced to employ a man to take care of his own customers, and that he was no expert grader of cotton.

At the time of the issuance of this policy, he was engaged solely as manager of the Woodward-McCutchen Company, and such was his sole occupation up to the time of his disability.

The respondent also testified that it was by reason of his disability that he was forced to close out his business in the fall of 1927, and even had to depend upon clerks to do the work of closing out.

He further testified, with regard to the effect of his present condition on his ability to perform his accustomed duties,

that he was "totally incapacitated" to "buy cotton or do a supply business," and that he had not been able to find any "work, profession, or occupation" that he could profitably pursue in his present condition. In his letter of demand for indemnity upon the company he stated plainly at that time that he was totally incapacitated for his business, and in another letter stated that he was suffering from "total disability."

Dr. C. W. Harris, a physician of thirty-four years' experience, testified that the respondent was "totally disabled to transact any ordinary business," and was disqualified to farm.

Mr. J. E. McCutchen, the brother of the respondent, testified that the latter was "totally disabled from handling business successfully," and that this condition was permanent.

Dr. H. M. McClure, a witness for the appellant, who testified while "deafness would hurt a good deal" and would render one "unable to carry on his business satisfactorily," gave to the company a signed confidential total disability report on the case in which the respondent was declared *totally disabled.* This witness, when cross-examined at the trial in regard to what he understood the words "total disability" to mean, said that he applied the term to "hearing" alone, and that he, referring to respondent, "still has his sight," and therefore was "not totally disabled;" that what he had in mind in testifying as to *total disability* was that condition which existed when a man was "knocked out completely; lost his reason," and that the respondent was *not* totally disabled, as "there were some things he could do."

It cannot be questioned from the record that the respondent in this case is a man of outstanding integrity and character, and, if so, he certainly would not be inclined to misrepresent, consciously, his own physical condition and capacity, which are best known to him.

In the trial, he appeared in his home town and home county before a presiding judge and twelve jurors who either

knew him personally, or knew him by reputation, and likewise were acquainted with the witnesses in the case. These jurors saw the respondent, and were much more able than the members of this Court to judge as to his physical condition and the disabilities under which he labored.

Total deafness may mean "total disability," as that term is known to our law, as to some particular person, and it may mean practically nothing, when applied to some other person, in the matter of earning a livelihood or ability to engage in an occupation or employment. There are many, many things to be considered in correctly determining the effect of deafness upon a person's ability and capacity. Each case must stand upon its own peculiar facts, for as the authorities hold, "total disability" is a relative matter. It is impossible for this Court to lay down any rule of law, which could operate as an absolute standard or guide in the many cases which may have to be determined. The safe rule—in fact the only rule—when there is conflicting evidence, is to permit twelve men, constituting a jury, to hear the evidence, see the witnesses, and determine what is right.

There was ample testimony to warrant the presiding Judge in submitting the case to the jury.

A careful examination of the record shows that the special presiding Judge was exceedingly fair to both parties in the trial. There is no question here as to any ruling he made as to the admission or rejection of testimony. He charged the law fairly and clearly in accord with the decisions of this Court. The issues were for the jury, and their verdict was against the appellant. There is no error of law which warrants this Court in disturbing that verdict.

A majority of the Court agreeing with these views, the judgment of this Court is that the judgment below be affirmed.

Mr. CHIEF JUSTICE WATTS and MESSRS. JUSTICES STABLER and CARTER, concur.

MR. JUSTICE COTHRAN (dissenting) : This is an action for certain benefits, as will be explained, in a policy of insurance issued upon the life of the plaintiff, in the sum of $5,000.00. There was incorporated in this policy a clause by which the company agreed to waive payment of the premiums and to pay to the insured a monthly benefit of $75.00 if, before he reached the age of 60 years and while the policy was in force, the insured should become permanently and totally disabled as defined in the policy.

The plaintiff became totally deaf about the 10th of June, 1927, nearly three years after the issuance of the policy, and filed a claim with the company for the disability benefits in September following. The company declined to honor the claim upon the ground that the plaintiff was not so disabled by his deafness as to prevent him from performing any work or engaging in any occupation or profession for wages, compensation, or profit.

The plaintiff brought this action on February 13, 1928, seeking to recover twelve monthly payments of $75.00 each, alleged to be due, and for the return of a premium of $234.80 which he had paid under protest, during the pendency of the alleged disability.

The case was tried before his Honor, R. W. McLendon, Special Judge, and a jury, at the summer term of 1928.

At the conclusion of plaintiff's testimony, the defendant moved for a nonsuit upon the ground that his disability did not come within the terms of the policy. The motion was overruled, and, at the conclusion of all of the testimony the defendant moved for a directed verdict upon the same ground, which also was refused.

The jury returned a verdict in favor of the plaintiff for $935.51, and, from the judgment entered upon that verdict, the defendant has appealed upon exceptions which fairly present the questions hereinafter discussed.

The provisions of the policy, which were set up by the defendant as a defense to the plaintiff's action, are as follows :

"Permanent Total Disability Benefit.

"Should the insured, before the anniversary of this policy nearest the date on which he shall attain the age of sixty years and while this policy is in full force and no premium thereon in default, become permanently totally disabled, as hereinafter defined, the company, subject to the conditions hereinafter set forth, will waive the payment of all future premiums required under the conditions of the policy as they become due and pay the insured a monthly income of $75.00, such waiver to be effective and the first of such monthly income payments to become due and the period of liability to commence as of the date of receipt at the home office of the company of due written proof of such disability and a subsequent payment to be made on the first day of each month thereafter during the continuance of such disability. Such waiver of premiums and income payments shall not affect any other benefits or values provided under the policy.

"Permanent total disability, as used herein, is defined to mean:

"(1) Disability caused by accidental bodily injury or disease which totally and permanently prevents the insured from performing any work or engaging in any occupation or profession for wages, compensation or profit; or

"(2) Disability caused by accidental bodily injury or disease which totally prevents the insured from performing any work or engaging in any occupation or profession for wages, compensation or profit and which shall have totally and continuously so prevented the insured for not less than ninety days immediately preceding the date of receipt of due written proof thereof; or

"(3) The irrecoverable loss of the entire sight of both eyes, or the amputation at or above the wrist or ankle of both hands or both feet or a hand and foot, if such loss or amputation is caused by accidental bodily injury or disease."

The undisputed personal history of the insured was as follows: He attended the common and high schools at

Bishopville; graduated at the University of South Carolina in the spring of 1903, and in the same year graduated in bookkeeping and banking at Eastman Business College, Poughkeepsie, N. Y.; in 1904 was assistant cashier of the People's Bank of Bishopville and so continued until 1906; he then commenced farming upon his father's place and continued such operations until 1912; he then became an organizer and general manager of a corporation known as Woodward-McCutchen Company, doing a general supply business and buying cotton; this engagement continued until 1925, when he bought out the mercantile business and continued it until its liquidation on January 1, 1928; since 1912 he has been jointly interested with his brother farming, and in 1928, at the time of the trial, they were jointly cultivating between 350 and 400 acres of cotton and in 1927 had made 65 to 75 bales of cotton; plaintiff admitted that he could grade cotton, and as well as he ever could, and that he was as good a farmer as the average; outside of his deafness his physical condition is good; he appears otherwise to be a normal, healthy, and educated man, certainly qualified to engage in *some kind* of gainful occupation, and, if so, not disabled within the terms of the policy.

It will be observed that the provision for disability benefits, in addition to the indemnity payable upon the death of the insured, is an extraordinary one, and of very great value where the insured shall have become entitled to it under the conditions named. Such being its character, it is but reasonable and just that the insured comply with such conditions in order that he may receive the benefit of it. The provision has no place in ordinary life policies; it is a matter of contract, perfectly legal and unambiguous; and no reason appears why the contract as voluntarily entered into between the parties may not be enforced. The policy provides not only life insurance in the ordinary acceptation of the term, but it provides for not only the cessation of the payments of

annual premiums but for a monthly income of $75.00 so long as the disability continues. It is but natural that so great a benefit, carrying the insured for the whole amount of the policy, without the payment of premiums and with the payment of the monthly income, should be hedged about with what may be considered drastic conditions. Whether drastic or elastic, they are perfectly legitimate, and therefore such as may, by convention of the parties, be imposed.

The policy provides in general terms, first, that the insured shall become "permanently totally disabled," and, unwilling to leave these terms to be debated as to their meaning, proceeds to define "permanent total disability," and to give the insured the benefit of the condition if he can bring his disorder within one of three classes: (1) A disability which *totally and permanently* prevents him from performing *any work or engaging in any occupation or profession* for wages, compensation or profit; (2) a disability which *totally* prevents him from such engagement for not less than ninety days immediately preceding proof thereof; (3) the loss of the sight of both eyes and other misfortunes named, not pertinent to the present inquiry. NOTE.—It will be observed that subdivision 1 refers to a total and permanent disability, lasting for all time while the second refers to a total disability which is temporary in its nature and continues for at least ninety days. The exclusion of deafness in the third subdivision, referring to the loss of both eyes and other misfortunes, is significant.

The insured is not claiming under either the second or third subdivision, but under the first: A total and permanent disability which prevents him from performing any work or engaging in any occupation or profession for wages, compensation, or profit, which, of course, if the contract is to be allowed to control, he is obliged to successfully maintain.

The only disability sought to be established by the insured was deafness. I do not think by any conceivable construction

of the words "total disability" can deafness of itself be embraced within its meaning. The loss of this faculty by itself does not deprive one of the opportunity and privilege of "performing any work or engaging in any occupation or profession for wages, compensation or profit." Numerous fields of endeavor are open to such persons who are unfortunately deprived of this sense. There was no showing that deafness materially affected the proper functioning of the other senses and organs of the body, and the Court may well take cognizance of this fact. The insured is a highly trained man, exceedingly above the average in intelligence, judgment, and ability, and to say that his inability to perform any work by reason of such deafness is to assume that his education, natural talents, and business experiences are of no avail. It appears that he has been since the commencement of the disability complained of, and is now, performing work for compensation or profit, a fact which is abundantly supported by the record. He admits that he owned and had general supervision over the management of his large mercantile establishment until he decided to liquidate its affairs on December 31, 1927. He also stated that he and his brother have been for a number of years past, and were at the time of the trial of the case, engaged in intensive joint farming operations. These two instances, in themselves, are sufficient to refute the claim that he is disabled as provided in the policy, and that he is not now able to perform any work or to engage in an occupation or profession for compensation, gain, or profit.

The case of *Brown v. Ins. Co.,* 136 S. C., 90, 134 S. E., 224, 225, does not at all aid the case of the plaintiff. There was abundant evidence in that case to substantiate the claim of the plaintiff that his disability prevented him from engaging *in any gainful occupation,* as the policy provided; and, upon that ground, the judgment, in a law case, for the plaintiff, was affirmed. The plaintiff testified that he was totally unable to do anything, and had been advised by his

physicians not to attempt it. His physicians testified that he was totally disabled from his waist down, and would remain so as long as he lived—that he could not and should not attempt to do any kind of work, mental or physical, that it would prolong and aggravate his disease; that *"his disability is of such a nature as to prevent plaintiff at all times hereafter from engaging in any gainful occupation."*

And so with the *Taylor case,* 106 S. C., 356, 91 S. E., 326, 327, L. R. A., 1917-C, 910. That case was decided upon the theory that "the man of waning years, of small means, of no education, totally dependent upon the strength of his body for a livelihood, is bankrupt when the marvelous and mysterious parts of his organism go wrong. If they do not answer the summons of his will, if indeed it is able to summon them, to do the common tasks, he is undone, and for his purposes totally undone."

It is true that the learned justice in that case observed: "* * * He is deemed totally disabled when he is no longer able to do his accustomed task, and such work as he has only been trained to do, and upon which he must depend for a living."

The case did not call for such an expression which is clearly erroneous. The writer in his boyhood days knew a German who was a member of Co. B, Orr's regiment, his father's company; he was a shoemaker, and in one of the battles of the war lost a leg amputated near the hip, which totally incapacitated him for his accustomed occupation; at the close of the war his captain set him up as a cigarmaker, at which occupation he made a comfortable income and amassed a small fortune.

To hold that one may recover under a policy which provides that his disability must be such as is here described, upon proof simply that he has been disabled from pursuing his usual occupation, without showing that he is disabled from every other, is manifestly reading into contract something that is not there.

There is a sharp line of distinction between the cases which involve a disability clause which pertains to the usual occupation of the insured and those which involve the very different clause which appears in the present policy.

As is said in *Hurley v. Ins. Co.*, 198 Iowa, 1129, 199 N. W., 343, 344, 37 A. L. R. 146: "Many cases have been before the Courts involving construction of contracts of this character, which, however, are not always identical in phraseology. The cases fall quite readily in two general classes: Those wherein the policy provides for idemnity if the insured is disabled from transacting the duties pertaining to the occupation in which he is then engaged, and those wherein the policy provides for indemnity if the insured is disabled from performing any work or following any occupation. This case belongs to the latter class."

In that case the Court further said: "The fifth instruction is equally erroneous. The contract of insurance binds defendant to indemnify plaintiff for loss of time while totally disabled and prevented from the transaction of all kinds of business. The Court tells the jury that this does not mean what it plainly says, but that defendant will indemnify plaintiff for loss of time while disabled, and prevented from the transaction of any business in which he was qualified to engage. Under this instruction the defendant's liability is governed by the plaintiff's versatility. If the plaintiff is skilled in but one business, and can pursue but one employment, and is disabled from pursuing that he may recover; but if he has greater skill, and can turn his attention to other pursuits, he cannot recover, unless he is disabled from engaging in any employment for which he is qualified. The parties have not incorporated any such condition in the contract. There is no reason nor justification for wresting from the language employed its natural signification, and placing upon it a construction which substitutes for the contract which the parties have made one of entirely different signification, and one imposing upon the defendant a greatly enlarged liability.

The language of the parties is plain, unambiguous, and needs no construction. It provides that defendant shall be liable for loss occassioned by being totally disabled from all kinds of business. Effect should be given to this language. It should be understood to mean what it says. It cannot be claimed that it means that defendant will indemnify on account of loss sustained by being partially disabled from some kinds of business; and yet this is the construction which the two instructions we have been considering place upon it."

In *Buckner v. Ins. Co.*, 172 N. C., 762, 90 S. E., 897, the Court said: "If the policy contained an agreement to pay in case plaintiff was totally disabled from following his usual occupation (as was the contract in many of the adjudicated cases), we should hold that he is entitled to recover upon the facts of this case. But the evidence fails to disclose a total disability that will 'permanently, continuously, and wholly' incapacitate plaintiff 'from pursuing any and all gainful occupations.' The authorities are practically manimous that under the terms of this policy plaintiff cannot recover without showing a bodily injury that will incapacitate him, not only from following his usual avocation of fireman, but also from pursuing any other gainful occupation. The language is too plain, and the meaning too unmistakable, to permit an enlargement of the terms of the contract by construction."

Continuing: "Referring to the meaning of the words 'wholly disabled,' May on Insurance, § 522, says that the ability of the insured to engage in some business will prevent recovery unless the insured is disqualified to engage in any occupation. Mr. Beach says, substantially, that 'total disability' that would entitle a member of an insurance order to recover must be not only permanent, but total, so as to render him unable to perform or direct any kind of labor or business. Ins. § 262. Bacon says that 'total disability' naturally means being totally disabled for all kinds of business unless

by the contract the disability is to be only from the usual occupation of the insured."

Mr. Cooley, in the Second Edition of his Briefs on Insurance, vol. 6, p. 5548, says: "The provision may limit total disability to inability to carry on any and all kinds of business. Under such a clause the insured must be unable to perform, not only the duties of his usual occupation, but the duties of any other occupation"—citing Supreme Tent of *Knights of Maccabees of the World v. King,* 79 Ill., App. 145; *Lyon v. Railway Passenger Assur. Co.,* 46 Iowa, 631; ·Supreme Tent of *Knights of Maccabees of the World v.* Cox, 25 Tex. Civ. App. 366, 60 S. W., 791.

In *Lee v. Ins. Co.,* 188 N. C., 538, 125 S. E., 186, the syllabus is: "Language of policy, 'wholly incapacitated and thereby permanently and continuously prevented from engaging in any avocation whatsoever for remuneration or profit,' means that disability must incapacitate insured, not merely from pursuing usual avocation, but from engaging in any avocation for remuneration or profit, whether actually profitable or remunerative."

In *Albert v. Order of Chosen Friends* (C. C.) 34 F. 721, it was held: "So, where the contract provided that the insured must be unable to follow 'his usual or other occupation,' one who, though unable to follow his own trade or profession, could perform the duties of another occupation, could not recover."

In 1 C. J. 465, it is said: "Where the policy, while providing indemnity when the insured is permanently disabled from following his usual or other occupation, at the same time defines disability which shall entitle him to recover as one which shall permanently prevent him from following any occupation whereby he can obtain a livelihood, it has been held that there can be no recovery if the insured can earn a living at any other occupation, although incapacitated for his original profession or occupation."

And: "But the question whether the insured is disabled from prosecuting some other occupation is to be determined by a consideration of his education, experience, age and natural ability."

And further: "Under a provision for an indemnity where the insured is 'totally disabled and prevented from the transaction of all kinds of business' there can be no recovery when the insured is totally disabled in his own occupation merely, provided he is able to engage in some other pursuit."

And further: "Under a provision for the payment of indemnity where the insured sustains 'a total permanent disability to perform or direct any kind of labor or business,' it is necessary to show that the disability is total as well as permanent. The phrase 'total inability to labor' means a total disability to earn a livelihood at any employment and if the insured, although unable to earn a livelihood at the particular labor in which he was engaged at the time of the injury, is capable of making a living at some other employment, he may not recover."

In *Starnes v. U. S.* (D. C.), 13 F. (2d), 212, it is said: " 'Total disability' is impairment of mind or body rendering it impossible for disabled person to follow any occupation, and is deemed permanent when founded on conditions rendering it reasonably certain throughout person's life."

In *Baltimore & Ohio Employees' Relief Ass'n v. Post*, 122 Pa. 579, 15 A. 885, 2 L. R. A. 44, 9 Am. St. Rep. 147, the Court said: "The phrase 'total inability to labor,' contained in the constitution and by-laws of an employees' relief association, means a total inability to earn a livelihood in any employment, and not at the * * * employment at which the member was engaged at the time of his injury."

In 1 Cyc. 270, it is said: "Where the phrase 'total inability to labor' is used, it is more inclusive, and means a total disability to earn a livelihood at any employment."

In *Rhodes v. Ins. Co.*, 5 Lans. 71, 77, the Supreme Court of New York says, in a case similar to this: "While the

policy is to be liberally construed, its provisions cannot be disregarded. To make the defendant liable, total disability to labor must be shown."

Mr. Joyce says: "Total disability and similar expressions in accident and benefit insurance. In ascertaining the meaning, reference must be had to the entire contract and the exact terms used. The words may necessitate that the assured should be so far disabled as to prevent his following any occupation or labor." Insurance, § 3031.

Mr. Joyce further says: "In an Ohio case, under a policy providing for periodical payments while insured is totally disabled and prevented from the transaction of all kinds of business, it is held that the contract should be enforced as it reads, and that the assured cannot recover because totally disabled for his own trade or business if he retains health, strength and physical ability sufficient for the pursuance of any other vocation, whether he is conversant with the same or not." § 3031.

If the contention of the plaintiff should be sustained, that the disability refers to the usual occupation of the insured, in spite of the express provisions of the policy, any permanent injury which would affect the ability of the insured to perform the customary duties of his occupations would be considered a total and permanent disability, regardless of his capacity to engage in some other occupation. Hundreds of men and women, blind or deaf, have filled position of honor and trust, congressmen, lawyers, teachers, ministers of the gospel, and many others. One notable instance that comes to mind is that of Helen Keller, deaf, dumb, and blind, who has made a national reputation as a scholar, teacher and philanthropist.

In 1 Couch Enc. Ins. Law, 363, it is said: "If the terms of the policy are clear, consistent, and unambiguous, no forced or strained construction can be indulged, even to give effect to the policy, for a contract of insurance cannot be given an interpretation at variance with the clear sense and

meaning of the language in which it is expressed. So, while every reasonable inference should be drawn to sustain insurance written and accepted in good faith, this does not mean that facts should be distorted, and unnatural and unreasonable inferences resorted to."

And: "Where an insurance contract is not ambiguous, words will not be interpolated for the purpose of rendering it ambiguous, or subject to a construction other than that indicated to a construction other than that indicated by the clear import of the language used. And an insurance policy, like any other contract, cannot have new terms inserted therein, nor original terms altered or withdrawn, save with the consent of the contracting parties, or their duly authorized agents acting within the scope of their authority."

And: "In the absence of statutory provisions to the contrary, insurance companies have the same right as individuals to limit their liability and impose whatever conditions they please upon their mutual and reciprocal obligations, not inconsistent with public policy."

And: "Consequently, as the parties to a contract of insurance have the right to contract as to the risks the company will or will not assume, provided the same be not in contravention of law or public policy; and it is presumed that they fully understand its provisions, if the terms of the contract are clear and express, the Courts cannot extend or enlarge the contract by implication or construction so as to embrace an object or limitation distinct from that originally contemplated and not included in the express provisions; nor can the Court make or vary the contract to meet or fulfill any notions of abstract justice or moral obligation, no matter how stringent its terms may be. Again, since in insurance contracts the insurer undertakes to guarantee the insured against loss or damage upon the exact terms and conditions specified in the agreement, and upon no other, the Courts cannot change the contract, or make a new one for the parties, in violation of plain and unambiguous language used by

the parties; rather, it is their duty to enforce and carry out the one already made, without importing anything into the contract by construction contrary to its plain meaning or express terms."

Even if the defendant's motion for a nonsuit or for a directed verdict cannot be sustained, an examination of the Judge's charge, the requests of the plaintiff charged, and those of the defendant refused, covered by exceptions, will demonstrate that the principles announced by him are completely and inevitably antipodal to the principles above announced, which are sustained by the overwhelming weight of authority.

The judgment of this Court should be that the judgment of the Circuit Court be reversed, and that the case be remanded to that Court, with instructions to enter judgment for the defendant under Rule 27.