14112

THOMPSON v. AETNA LIFE INS. CO. OF HARTFORD, CONN.

(180 S. E., 880)

*Mr. Henry E. Davis* for appellant,

*Messrs. Bennett* and *Carroll* for respondent,

July 18, 1935.

The opinion of the Court was delivered by Mr. Justice Fishburne.

The plaintiff, as one of the employees of J. L. Anderson, of Cheraw, S. C., brought this action on a group policy of insurance issued to Anderson by the defendant for the bene-

fit of the employees in his veneer mill at Cheraw, S. C. Under the terms of the policy each employee was insured to the amount of $1,000.00, to be paid either at his death or to the employee personally in the event he should become totally and permanently disabled before attaining the age of 60 years, and while insured under the policy. The insurance contract was originally issued on September 16, 1925, and was cancelled on November 15, 1933.

In his complaint the plaintiff alleged that while in the employ of J. L. Anderson he became totally and permanently disabled within the meaning of the terms of the policy prior to November 15, 1933, and sought to recover the sum of $1,000.00 actual damages therefor.

A second cause of action was set out in the complaint, based upon fraudulent breach of contract, but it is not necessary to consider this phase of the matter, for the reason that at the conclusion of the plaintiff's testimony a verdict was directed in favor of the defendant on this cause of action.

The defendant denied all the material allegations of the complaint, and set up by way of an affirmative defense that the group policy upon which the action is based was issued by the defendant on the employees of J. L. Anderson on September 16, 1925, and cancelled on November 15, 1933; that the plaintiff continued in the employ of Anderson, and worked long after the cancellation of the said group policy upon which his action is based, during all of which time he was not totally disabled; therefore he could not have become totally and permanently disabled during the continuance of the insurance as required by the terms of the disability clause. It is conceded by the appellant that the premium payment made by the plaintiff in November, 1933, under his testimony was applicable to the policy sued upon, and continued it in force at least through December 16, 1933.

The cause was heard at Bennettsville before his Honor, Judge J. Henry Johnson, and a jury, resulting in a verdict

in favor of the plaintiff for $1,000.00 on his first cause of action.

At the close of plaintiff's testimony the defendant made a motion for a directed verdict in his favor, which was refused as to the cause of action for actual damages. After the announcement of the verdict and before the jury was discharged, the defendant renewed its motion for a directed verdict on the first cause of action, which, being refused, the defendant then made a motion for a new trial, which was likewise refused.

That portion of the provision of the policy upon which suit is brought, pertinent to the issues presented here, reads as follows: "If any employee, before attaining the age of sixty years and while insured hereunder, becomes totally disabled and presumably will thereafter during life be unable to engage in any occupation or employment for wage or profit, or shall meet with the entire and irrecoverable loss of the sight of both eyes or of the use of both hands or both feet or of one hand and one foot, such employee shall be deemed to be totally and permanently disabled."

It appears from the testimony introduced on behalf of the plaintiff that he was a skilled, capable, and industrious workman, employed at Cheraw, in the veneer plant of J. L. Anderson, and had been so employed for a period of 12 years continuously, prior to January 1, 1934, and for the last six years of his employment he occupied the position of foreman in the lathe room. This was the only kind of work he was skilled and trained in doing. It constituted his sole and customary method of making a living for himself and his wife and two children, and he was not skilled in any other line of work.

It will be borne in mind that the policy of insurance under which the plaintiff sued was cancelled on November 15, 1933 (although valid and effective until December 16, 1933), so that the real and vital question for the Court to determine in this case is whether there was sufficient

competent evidence to be submitted to the jury in support of the allegations that the plaintiff was totally and permanently disabled while the policy in suit was in effect. We shall also pass upon other questions made by the exceptions.

In October, 1931, while engaged in working one of the lathe machines, a small piece of steel broke from some part of the machinery, and was projected into his left eye, in consequence of which he lost the eye. By reason of this injury he was unable to continue his work for about five weeks, at the end of which time he returned to the mill and worked there continuously until January 1, 1934, except for a period in March, 1932, when he suffered an attack of influenza which incapacitated him for a short while.

The testimony for the plaintiff shows that he relates the commencement of his permanent and total disability to the date of the injury to his eye; that is, in October, 1931. The evidence shows that following this injury the plaintiff developed a nervous condition, culminating in "spells" at the end of each work week, and which grew gradually and progressively worse throughout the years of 1932 and 1933. He became nervous and irritable, and was obsessed with the fear that he would do some physical injury to his wife and children. This fear became so intense during the period referred to that at his request such dangerous instrumentalities as axes, knives, and scissors were hidden when he was in the house.

The testimony of Mrs. Thompson, plaintiff's wife, shows that plaintiff complained of headache all the time, was nervous and irritable from the period commencing with the injury to the eye until finally the children could not come into the house because the noise they made distracted him, and that it was almost impossible for her to stay in the house with him as the end of each week approached; that his physical and mental deterioration became so acute that on January 1, 1934, she persuaded him to stop work. It is in testimony that prior to his voluntarily

quitting work on January 1, 1934, he continuously made threats against his wife and his children, and would walk the floor and the streets at night.

Doctor Kenny, a local physician who treated him in January, 1934, testified to his mental hallucination with reference to nervous fears, his despondency; that he was "sick in the brain," and that he was suffering from an acute attack of psychoneurosis when the doctor saw him in January and February; that when he attended him he presented all the appearances of a crazy man, and was totally and wholly unfit for work in the capacity of a machinist foreman. Dr. Kenny attributed his mental condition and illness to a physical basis, existing prior to his examination. He described psychoneurosis as "where you have a lot of fears and horror and dread, and he can't get it out of his head." He further stated that the plaintiff discussed his symptoms with him fully, and also his mental condition, stating that he was afraid that he would kill his wife and his children. The doctor also testified that the plaintiff might have lucid intervals, and that he might improve and even do some work, but the witness refused to venture the assertion that the plaintiff would return to a normal condition.

The witness Wilson, who was a general machinist in the J. L. Anderson veneering plant, testified: That following the injury to his eye plaintiff was unable to perform his work as foreman in the plant in substantially his customary and usual manner; that after this injury the plaintiff would fail in his work toward the last of each week, and that noticing this condition he would assist him; that this inability on the part of the plaintiff to perform his work became much worse about the fall of 1933, and especially in October and November of that year.

The witness H. H. Griffin, a brother-in-law of the plaintiff, who lived at Bennettsville, testified with reference to the plaintiff, in part as follows: "After he got his eye put out, I know that he never has been exactly the same, still

he was not seriously ill then; but as time went on, I will say about the middle of last September. (1933), or in September, I would go to Cheraw the week-end and get him and bring him here to stay with me. He seemed to be very nervous and shot all to pieces. I didn't go every week-end, but two or three times a month."

About the middle of January, 1934, the plaintiff, upon his own initiative, was admitted to the State Hospital in Columbia, where he remained, with one intermission, for a period of three months. While there he was especially under the care of Dr. Herger.

Dr. Herger testfied that the plaintiff was at that time suffering from psychoneurosis, psychothenic type; that the plaintiff had the most extreme form of this disease; and that in his opinion he was an insane and dangerous man. He stated further that the injury to or loss of the eye suffered by plaintiff might have acted as an exciting factor in bringing on his mental trouble; that no change had taken place in the condition of the plaintiff between the time he was first admitted to the hospital and when he was admitted for the second time. Dr Herger stated that in his opinion plaintiff was totally disabled when he examined him in January, 1934, and that from the history of the case, and based upon his examination of the patient, this total disability must have existed for some months prior to that time. He could not say positively if the disability would be permanent, but testified that the plaintiff might improve somewhat, or that he might become worse and worse.

The exceptions made by the appellant present five questions, which we will discuss in the order in which they appear in its brief:

In a suit for total disability under an insurance policy, was it proper to introduce evidence as to a specific injury received prior to such total disability?

This question is settled adversely to the contention of the appellant in the case of *Marshall v. Kansas City Life Insurance Company*, 171 S. C., 321, 172 S. E., 504, 506, where the Court said: "It is true the insured lost only one hand but, in our opinion, the fact that he did not lose both hands or one hand and one foot did not preclude him from recovering under the policy for total and permanent disability, if the facts in the case, to be determined from the testimony, which was a jury question, show that he had by loss of one hand or in some other way become totally and permanently disabled, within the meaning of the provisions of the policy, under the rule declared in the case of *McCutchen v. Pacific Mutual Life Insurance Company*, *supra* [153 S. C., 401, 151 S. E., 67], and *Davis v. Metropolitan Life Insurance Company, supra* [164 S. C., 444, 162 S. E., 429]."

2. Was it proper to allow a coemployee to testify as an expert as to the manner in which the injured performed his duties when coemployee was not an expert and had no control whatever over such insured?

There is no merit in the exceptions raising this point. After the so-called expert testimony of the witness Wilson was elicited, his later testimony along similar lines fell within the range of common experience and observation, and was properly admitted. The defendant suffered no prejudice by the admission of this testimony.

Besides, the real question is not whether the plaintiff performed his work satisfactorily in the light of the efficiency of other workmen, but, rather, whether he is unable "to do substantially all of the material acts necessary to the prosecution of the insured's business or occupation, in substantially his customary and usual manner." *McCutchen v. Life Insurance Company*, 153 S. C., 401, 151 S. E., 67, 71.

We can see no objection to this witness testifying to the actual state of facts from his knowledge.

3. The third question raises the same issue as the question which we have just discussed, and what we have said with reference to it also disposes of the third question.

4. Was it error for Dr. Herger to read in evidence the statements made to him by the plaintiff at the time he examined him at the State Hospital in Columbia?

"It is well settled, that what a patient has said of his own feelings, pains, etc., while afflicted with a disease which is the subject of judicial decision, may be told by the witness, and is competent evidence. Such expressions are the indications or symptoms of the disease itself; and cannot be separated from it. A dumb patient would writhe and point to the seat of his pain; while one who spoke, would indicate the same thing in words. In such cases, the words or gestures, are equally the signs of the disease felt by the patient. They are both acts, or parts, in the detail of the disease which we seek to discover; and come within what is well understood by the *res gestae*—the thing in all its exhibitions," *McClintock v. Hunter,* Dud. 327, 328 (1838), per Richardson, J.

"\* \* \* Even insanity may be shown by proof of relevant unsworn statements. *Not as proof of the truth of what is said, but as characterizing the mind from which they emanate* (italics ours), are such utterances regarded as evidentiary. They are as probative as any other conduct raising the same inferences would be." Chamberlayne on Evidence, Vol. 4, § 2641, p. 3604.

"\* \* \* Should it appear that the declarations were made *post litem motam* to an attending physician or a skilled medical observer for the purpose of enabling the latter to testify as a witness for the declarant, the inference of trustworthiness largely disappears or is even reversed, the declarations being rejected by careful administrators as unreliable. \* \* \* " Id., § 2635, p. 3593.

But there is nothing here to indicate that the plaintiff in making these statements to the doctor was actuated by any such calculated duplicity as is suggested in the foregoing rule. The opposite is suggested.

"Where the question is as to the effect of an injury upon the mind of plaintiff, it is competent to show his mental status before the injury, and also to show his mental status continuously from and after the injury. In order to establish such status, it is not necessary that a single witness shall be able to testify as to the entire time. It is sufficient that the evidence as a whole shall afford such facts as will enable the jury to form a judgment in the matter. Evidence as to plaintiff's mental condition after the injury is also admissable where it is necessarily involved in a fair description of his condition after the injury." 17 C. J., 1033.

A consideration of the testimony convinces us that the Circuit Judge committed no error in permitting Dr. Herger to read in evidence the statements made to him by the plaintiff at the time he examined him at the State Hospital in Columbia. The foregoing authorities support this holding.

In *Stack v. Prudential Insurance Company of America,* 173 S. C., 81, 174 S. E., 911, the Court held that a physician's testimony that he diagnosed patient's condition as epilepsy grand mal by using nurses' notes and other physicians' reports, without having observed the patient in a seizure, was incompetent and hearsay.

In passing upon this question, Mr. Justice Bonham, who wrote the opinion, remarked that no opportunity was given the defendant to cross examine the nurse upon whose notes and reports Dr. Gabel predicated his diagnosis of epilepsy grand mal; no opportunity to test her accuracy, her competency, her reliability, or her experience.

But in the instant case, Dr. Herger diagnosed the plaintiff's condition as being psychoneurosis without the aid of such hearsay testimony as was held incompetent in the

foregoing case. He stated that the plaintiff described his symptoms to him in detail, appeared terribly excited, and at times, during the recital, cried. All facts and circumstances were present in this case to enable him to make a first-hand investigation and diagnosis without relying upon anything of secondary character. In addition to this, it was stated at the time the evidence was offered in the trial below by plaintiff's attorney that the statements were not intended for self-serving declarations, but only for the purpose of showing upon what the doctor based his diagnosis. Furthermore, the plaintiff was present, testified, and was cross examined by the defendant. The exceptions raising this question must be overruled.

5. Under the facts of the case, should the Court have directed a verdict in favor of the defendant, and, failing in this, should the Court have awarded defendant a new trial?

In support of this question the appellant points out that the plaintiff worked continuously from November 15, 1933, until January 1, 1934, full time, and that he was paid his usual and regular wages for such labor, and it is argued from this that he was not suffering at that time from a condition of total and permanent disability. However, this does not follow conclusively in view of the testimony to which we have already adverted, showing his increasing inability to discharge his regular duties, and that his coemployee, Wilson, aided him in the performance of his work.

In numerous cases it has been held that "total disability" is a relative term, depending upon the occupation of the person involved, and the circumstances of each case, and should not be construed literally.

A careful consideration of the entire evidence satisfies us that upon this issue of total and permanent disability, its commencement, its degree, and its permanence, it is susceptible of more than one inference, and that the

Circuit Judge committed no error in submitting the case to the jury.

This case is ruled by *Smoak v. Southeastern Life Insurance Company*, 175 S. C., 324, 179 S. E., 56; *Richards v. Supreme Forest Woodmen*, 173 S. C., 63, 174 S. E., 907; *McCutchen v. Pacific Mutual Insurance Company*, 153 S. C., 401, 151 S. E., 67; *Marshall v. Kansas City Life Insurance Company*, 171 S. C., 321, 172 S. E., 504; *Taylor v. Southern States Life Insurance Company*, 106 S. C., 356, 91 S. E., 326, L. R. A., 1917-C, 910.

The second issue arising under this question relates to the sufficiency of the proof as to the furnishing of written notice to the defendant of total and permanent disability required by the policy.

"The forfeiture claimed by reason of the alleged failure to file sworn proofs of death is purely a matter of defense." *Carpenter v. Accident Co.*, 46 S. C., 541, at page 546, 24 S. E., 500, at page 501.

The defendant is in no position to have this point considered. It did not plead or introduce evidence to show failure to furnish proofs, merely contenting itself with the denial of plaintiff's allegation that he "furnished satisfactory evidence of said disability in accordance with the requirements and conditions of said policy."

However, such a forfeiture is an affirmative defense, to be proved by defendant. *Huguenin v. Casualty Company*, 94 S. C., 138, 141, 77 S. E., 751; *Frierson v. Casualty Company*, 100 S. C., 162, 84 S. E., 535; *Spann v. Phoenix Insurance Company*, 83 S. C., 262, 65 S. E., 232; *Thompson v. Piedmont Mutual Insurance Company*, 77 S. C., 294, 57 S. E., 848.

In the case of *Pickett v. Fidelity & Casualty Company*, 60 S. C., 477, 38 S. E., 160, 163, 629, it was alleged in the complaint that all the conditions of the policy had been duly performed, which allegation was denied by defendant's answer. The Court held that: "Such a denial does

not require a plaintiff in a suit on an insurance policy to prove compliance with the conditions in reference to forfeitures as a part of the plaintiff's case. It is incumbent on the insurer, when sued, to specifically allege any matter of forfeiture relied on."

The Circuit Judge committed no error in refusing defendant's motion for a new trial.

All exceptions have been considered, and are overruled.

It is the judgment of this Court that the judgment of the Circuit Court be affirmed.

MR. CHIEF JUSTICE STABLER and MESSRS. JUSTICES CARTER, BONHAM and BAKER, concur.