JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY OF BOSTON, MASSACHUSETTS, Appellant,

v.

R. H. BENNETT, Administrator of the Estate of Albert H. Steele, deceased, Appellee.

No. 7614.

United States Court of Appeals
Fourth Circuit.

Argued April 8, 1958.

Decided May 28, 1958.

L. R. Coulling, Jr., and Paul S. Hudgins, Bluefield, W. Va., for appellant.

Joseph M. Sanders, Bluefield, W. Va. (Sidney L. Christie, Keystone, W. Va., on the brief), for appellee.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and THOMSEN, District Judge.

HAYNSWORTH, Circuit Judge.

This is a suit upon a group life insurance policy issued to Eastern Gas and Fuel Associates and insuring the lives of its employees, including those at its Keystone mine in West Virginia. The policy provided that, as to any employee, the insurance should cease automatically upon the termination of his employment unless "he ceases active work due to sickness or injury * * *," in which event the insurance, as to him, is continued for a limited period.[1] The District Court found as a fact that Steele, the employee here, ceased active work because of a disease of which he subsequently died and then addressed itself to a further problem arising out of the provisions of the policy for premium contributions by the employees. 155 F.Supp. 1. The view we take of the first question makes it unnecessary that we consider the second.

Steele, a bachelor, had been employed for some years at the Keystone mine. In 1955, he was an assistant general foreman. Through October 26, 1955, he was regular in attendance and there is nothing to indicate that his work was unsatisfactory. His immediate superior testified that on that day, a Wednesday,

---

1. The controlling provisions of the policy are:

"INSURANCE TO BE DISCONTINUED

"The insurance of an employee shall cease automatically on the earliest of the following dates:

"(a) the date of expiration of the period for which the last required premium contribution is made by the employee;

"(b) the date of termination of employment of the employee which shall be the date the employee ceases active work, except that

* * * * * * *

"(ii) if the employee ceases active work due to sickness or injury, his employment shall be deemed to continue, for the purpose of insurance hereunder, during the continuance of such disability for a period of three months from the date the employee ceased active work, and thereafter during the continuance of such disability, until terminated by the Employer either by written notice to the Company or by any other means."

Though it is said that the insurance terminates on the date of termination of employment, it is elsewhere provided that if death occurs during the 31-day period within which conversion rights may be exercised, the face amount of the insurance will be paid whether or not there has been an application for conversion.

however, Steele sought, and obtained, permission to take the next few days off from work to go squirrel hunting. He did not return to the mine until November 9, 1955, but on that date he did report ready for work. Acting under instructions, the mine foreman refused him permission to go to work, and, instead, sent him to see the superintendent. The superintendent testified that Steele, confronted with a demand for an explanation of his absence, claimed he had been absent with the permission of the foreman. The foreman, called into the conference, admitted giving Steele permission to go squirrel hunting on Thursday and Friday, October 27 and 28, but denied having given permission for Steele's longer absence. Thereupon, the superintendent accused Steele of having been out drunk and with keeping two young women in his house for purposes which the superintendent assumed to be improper.

Steele was discharged by the superintendent either on November 9 or on November 15 when his final check, including salary for six days in lieu of notice and nine days separation pay, was picked up by him. His Field Separation Notice, dated November 15, 1955, notes the reason for discharge as "off without permission."

In its regular report for the month of November 1955, the employer advised the insurance company of the termination of Steele's employment, reporting that he had been "discharged."

So far as appears, Steele never complained about his discharge or gave any indication that he thought it was wrongful. Nor did he tell anyone in authority that he had any physical disability, and the record contains nothing to suggest that the employer knew that Steele was suffering under any disability on November 9, 1955, when he last reported for work. The foreman had observed that Steele would tire rather quickly when walking in a stooped position through "low coal," but it does not appear that this observation led him, or should have led him, to believe that Steele was unable to work.

It now appears, however, that Steele had consulted a physician on September 28, 1955, complaining of shortness of breath and a cough. The physician observed symptoms of cardiovascular disease. He gave Steele digitalis and instructions to rest, have a chest X-ray and report back in a week's time. The physician never saw Steele again, though it is possible Steele may have made an effort to see him during a period of a few weeks when the physician's office was closed because of his own sickness. The doctor testified he instructed Steele not to work until he was seen again, but whether he would have continued those instructions after a second visit was dependent upon what he then found.

Despite the doctor's instructions, Steele continued to work regularly for four weeks.

Steele died suddenly on the evening of December 20, 1955. A medical examiner certified, on the basis of the appearance of the body, that death was caused by arteriosclerosis and that antecedent causes were congestive heart disease and heart failure. A number of lay witnesses testified that in the weeks preceding the death, Steele had great difficulty in breathing, particularly at night, and other complaints, which, in the medical mind, might have been related to heart disease. At the time of the trial, however, Steele's father still associated the trouble with "rock dust" in his lungs or silicosis.

It is apparent from the foregoing that the finding that Steele had an arteriovascular ailment on October 26, 1955, the last full day he worked, is adequately supported by the record. But Steele did not cease active work on that day or the following day, for he reported for work on November 9, believing, or representing, himself to be ready and able to work. That he did not work on that day was not due to his physical condition, but solely and directly to his discharge. Whether he went squirrel hunting on October 27 or, feeling unwell, stayed at home is quite beside the point. Equally so are the questions of whether or not he was drunk

during the period October 27 to November 8 and the nature of his relations with the young women who resided in his house. The unalterable facts are that he was discharged because of his absence without permission and that he was prevented from working on November 9 by the command of the employer. He ceased active work within the meaning of the policy when, having returned to work on November 9, he was relieved by the employer of his duties, not on October 26 when, after a full day's work, he left, at the usual hour with permission to be absent the remainder of that week. What occurred on October 26 was a cessation of active work only in the temporary and limited sense that most employees in comparable positions do not take their work home with them and do not intend to return to work until expected by the employer.

■ This group insurance is for the benefit of employees of the employer. Ordinarily it is terminated, subject to certain conversion and other privileges, with the termination of the employment relation. This policy contains a typical provision to that effect. That it further defines the date of termination as the date upon which the employee ceases active work arises out of the common practice in industry of preparing notices and other papers which record the fact of termination of the employment relation, the reason for it and the amount of compensation and other payments due the employee. Thus, under the policy, in the case of a discharge, the crucial date is the day the employee is relieved of his duties, rather than such subsequent date upon which the necessary papers are completed. It is important that the policy specify which of the several alternative dates is intended, for the accrual of rights and computation of the time within which others may be exercised are dependent upon it.

■ When an employee, after reporting for work, is discharged, it hardly is to be said that the "date of termination of employment (being) the date upon which

the employee ceases active work" was some preceding day when, because the workday had come to its end, the employee went home. If Steele had never returned to work after October 26, the record would support a finding that he was sick and that he did not return because he felt unequal to the task. In that event it could be said that he ceased active work on October 26, or, at least, on the next workday when, because of illness, he failed to report. But when he reported on November 9, ready for work, and sought without reference to his physical condition, to justify his absence and retain his job, we can conclude only that he ceased to work on that day because of the discharge, not because of his physical condition.

It may be that an employee who has become incapacitated and is on his deathbed has acquired a fixed right, as against the insurance company, to be treated as one whose employment was terminated because of sickness, so that he cannot be deprived of that status by a subsequent discharge when shortages in accounts are discovered. Kopke v. John Hancock Mut. Life Ins. Co., 176 Kan. 451, 271 P.2d 279. When he returns to work, however, he is not immune to discharge. The question in each case is the immediate cause of the cessation of work and the answer is not dependent upon consideration of the possibility that other incipient or unknown causes may exist for termination of the employment relation. Kopke, through the shortages in his accounts, had exposed himself to discharge, but before the situation was discovered, his illness had occasioned the final and definite termination of his work. Here, on the other hand, Steele may have been in ill health, but that did not prevent his working on November 9; the discharge did.

Steele did not exercise his conversion right or take any step to continue his insurance. Concluding, as we do, that his employment terminated because of the discharge, not because of his physical

condition, his coverage terminated thirty-one days thereafter, prior to his death.

The judgment below will be reversed and the case remanded for the entry of judgment for the defendant.

Reversed.