James M. BLACKBURN, Appellant,

v.

JOHN HANCOCK MUTUAL LIFE IN-
SURANCE COMPANY, a corpora-
tion, Appellee.

No. 7767.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 16, 1959.

Decided March 11, 1959.

Joseph Luchini, Beckley, W. Va., for appellant.

Robert B. Sayre, Beckley, W. Va. (Floyd M. Sayre, Beckley, W. Va., on the brief), for appellee.

Before SOPER, Circuit Judge, and PAUL and BOREMAN, District Judges.

PAUL, District Judge.

This case pertains to a claim asserted by the plaintiff, James M. Blackburn, for benefits under a group insurance policy

issued by defendant covering employees of Eastern Gas and Fuel Associates by which plaintiff was employed. The provision of the policy pertinent to the issue in this case is as follows:

"* * * If any employee shall furnish the company with due proof that while insured under this policy and before having attained the age of sixty, he has become wholly disabled by bodily injuries or disease, and will be permanently, continuously and wholly prevented thereby for life from engaging in any occupation or employment for wage or profit, * * *"

The employment of the plaintiff with Eastern Gas and Fuel Associates (hereinafter referred to as Eastern) terminated on October 8, 1953. He claims that at or prior to that time he had become totally and permanently disabled within the meaning of the insurance policy and that he was entitled to the benefits which the policy provided for such a condition. When the case was heard in the District Court the trial judge, at the conclusion of the plaintiff's evidence, and upon motion of the defendant, directed a verdict in favor of defendant. The sole question before us is whether this action was proper or whether the evidence offered by the plaintiff was such as to require submission of the issues to a jury.

It appears that the plaintiff had been a coal miner practically all of his adult life and had worked for Eastern at various mines for about twenty-five years. Apparently all of his work, up until 1949, had been within the mines. Sometime in 1949 a medical examination revealed that he had silicosis in its early stages. The medical testimony is that silicosis, which is caused by the inhalation of silicon dioxide present in mining dusts, is a progressive disease. There is a difference of opinion as to whether, once contracted, it can be arrested by any treatment. In any event upon the disclosure in 1949 that the plaintiff had silicosis he was advised to get out of the mines and procure work that would keep him in the open air. Acting on this advice the plaintiff applied for and was given a job by Eastern as an outside foreman. He passed a physical examination for this position.

Plaintiff worked as outside foreman until in January, 1951, when he went to work for Ace Motor Company. However a little over three months later, on May 1, 1951, he returned to his job as outside foreman with Eastern and continued in that position until his employment was terminated on October 8, 1953. So far as the evidence discloses plaintiff's duties as foreman consisted of supervising or bossing what is termed the "bull gang" consisting of about a half-dozen employees whose work was to unload from railroad cars mine supplies and materials to be taken in supply cars up to the mines, which are stated to be a mile or more from the point where the materials were unloaded. Plaintiff states that when he first returned to the job as foreman in the early part of 1951 he was able to perform the duties imposed by the job, but that in the latter part of the year he noticed that he was growing weaker and that through 1952 his condition became much worse. He testified that his health continued to deteriorate throughout 1953 and that for some time prior to his discharge he was unable to take part in any of the physical labor done by his gang, that he had to take frequent rests, that he could stand on his feet for only limited periods, and that for much of the time he sat down, either in an automobile or in a railroad car, and from that position supervised the work of the other men.

The plaintiff's testimony as to his condition of health is supported by that of other employees of Eastern who had occasion to observe him. A Mr. Perdue (a brother-in-law of plaintiff) who was a superintendent for Eastern and a Mr. Muncy (no relation), who is described as plaintiff's "immediate boss", both had plaintiff under their observation for several years prior to July, 1953, and up until that date. They both testified that there was a progressive and rapid deterioration of plaintiff's condition of

health from the latter part of 1951 until July 1953. Muncy stated that plaintiff was not able "to perform the duties that I had for him"; and Perdue testified that plaintiff was unable to perform any manual labor at all in July, 1953, and continued to get worse after that.

When the plaintiff's employment was terminated in October, 1953, his discharge slip noted as the reason therefor "reducing force." But there is testimony indicating that another employee was placed in the same job, and it seems to be an open question as to whether his discharge was not due to his physical condition.

About eighteen months after his discharge by Eastern the plaintiff, in April 1955, undertook to work as a driver for a taxicab company in Beckley. This lasted for a period of about five months. Plaintiff's testimony in this regard is that he was ill and could not work regularly and that, because of this, in less than a month from the time he started driving the cab his employer told him he could no longer employ him; that, however, at plaintiff's request, his employer consented to keep him on for a while longer; that, there being no improvement in his condition, he was let go in September of 1955.

In cross-examination of the plaintiff counsel for the defendant subjected him to a lengthy inquiry apparently designed to show his ability to do physical labor. This questioning centered around work which plaintiff had done around his own home and on the premises of some of his neighbors. It consisted of such things as building a porch or a carport, some steps and siding and a few other improvements on his own house and in aiding in the building of a garage and in painting a house for a neighbor. It is unnecessary to go into a detailed discussion of this testimony. We do not consider it significant. It is sufficient to say that some of the various things inquired about were done before plaintiff was discharged by Eastern; and that as to those done later the plaintiff testified that the labor was performed mostly by his wife and his

son or someone else and that his participation was merely to supervise or advise or render some trivial assistance requiring no physical effort.

From the testimony presented there is no doubt that the plaintiff contracted silicosis while in the employ of Eastern and that, as a result of this disease, his condition of health deteriorated progressively until the date of his discharge. The effect of the disease, as testified to by the plaintiff, is that he had difficulty breathing, becomes very weak under any exertion and that whatever he does he is compelled to take frequent periods of rest.

The testimony of four doctors was offered by the plaintiff. One of these testified that on November 1, 1952, he made an examination of the plaintiff limited merely to taking his blood pressure and listening to his heart and lungs. At that time, this witness stated, the plaintiff clearly had "some disability"—the degree of which the witness did not attempt to fix. Two other physicians had examined the plaintiff and had X-rays taken on October 13 and 14, 1953, less than a week after his employment had terminated. Their testimony was that the X-rays showed the presence of silicosis in a moderately advanced stage and emphysema (a disease of the lungs). They expressed the opinion that the plaintiff was unable to do any manual labor. Asked whether the plaintiff could perform duties which required only that he walk around and supervise the work of others, one of the doctors said that he could do so only if he interrupted the performance of his duties by periods of complete rest at times throughout the day.

The fourth doctor was the one who had advised the plaintiff to get out of the mines after examining him in 1949. His next examination was not until August 13, 1956, approximately two years and ten months after plaintiff's discharge by Eastern. This examination showed that the plaintiff had silicosis, pulmonary emphysema and prostatic hypertrophy; that a vitality capacity test showed him

to have less than half of a normal ability to breathe; that he had hemoptysis (coughing up blood); that he became short of breath from walking on level ground and even from talking. The doctor stated that at this time (August 13, 1956) the plaintiff was "completely and totally disabled." When asked to express an opinion as to how long prior to his examination of plaintiff the condition of total disability had existed, the doctor stated that it was impossible to fix the time with exactness, but said it "would be reasonable to assume that it had been present for several years."

On consideration of the evidence offered by plaintiff, we think that it was such as to forbid direction of a verdict against him. There seems little question that plaintiff's illness is permanent and incurable and we think that the evidence is sufficient to require submission to a jury on the question of whether he was totally disabled therefrom at the time of his discharge.

There have been numberless litigated cases involving the application of the "totally and permanently disabled" clause in insurance policies. No good is to be served by recounting the holdings in numerous separate cases. It will be found that, while differing in exact phraseology, they are in general agreement as to a definition of what constitutes such disability. As good a definition as any other is that stated in Eggen v. United States, 8 Cir., 58 F.2d 616, 618, cited in appellee's brief:

"Total disability is any impairment of mind or body which renders it impossible for the insured to engage continuously in any substantially gainful occupation, and total disability is permanent if it is founded upon conditions which make it reasonably certain that it will continue throughout life."

The courts are also in agreement that the term "total and permanent disability" is not absolute in its meaning. It must be interpreted in connection with the facts of particular cases, involving consideration of various factors. As was said in Cody v. John Hancock Mut. Life Ins. Co., 111 W.Va. 518, 163 S.E. 4, 5, 86 A.L.R. 354:

" 'Total disability' is of course a relative expression. It does not mean absolute incapacity, mental or physical. The phrase must be construed rationally and practically." citing 14 R.C.L. p. 1316.

In 14 R.C.L. p. 1315:

"Total disability is necessarily a relative matter, and must depend chiefly on the peculiar circumstances of each case. It must depend largely upon the occupation and employment and the capabilities of the person injured."

See also Wolcott v. United Life & Accident Ins. Ass'n, 55 Hun 98, 8 N.Y.S. 263; Commercial Travelers' Mut. Acc. Ass'n v. Springsteen, 55 N.E. 973. And see Cato v. Aetna Life Ins. Co., 138 S.E. 787.

The language in the disability clause here, namely, "continuously and wholly prevented thereby for life from engaging in any occupation or employment for wage or profit" if taken with absolute literalness would seem to bar the plaintiff if he were able to do anything, no matter how trivial or infrequent, if it were something for which he received pay no matter how paltry. It is not to be so construed.

In the case of Atlantic Life Ins. Co. v. Worley, 161 Va. 951, 172 S.E. 168, 170, the court was called on to determine the effect of a clause in an insurance policy reading as follows:

"Disability shall be considered total when the insured becomes so disabled by bodily injury or disease that he is prevented thereby from engaging in any occupation whatsoever for remuneration or profit. * * *"

The appellate court, after stating that the trial court had misconceived the true meaning of the term "total and permanent disability" and had given too narrow an interpretation to the phrase "in

any occupation whatsoever", went on to say:

> "Total and permanent disability, as used in insurance policies, is a relative expression. It does not mean absolute incapacity, mental or physical. The term must be construed rationally and practically, and the trial court should have instructed the jury on the meaning of total and permanent disability in the light of the almost unanimous judicial interpretation of those words. The jury should have been told that the disability contemplated by the policy did not mean a state of absolute helplessness, but meant the inability to do substantially all of the material acts necessary to the prosecution of any occupation for remuneration or profit in substantially the customary and usual manner in which such occupation is prosecuted."

In examination of witnesses counsel for defendant suggested that plaintiff's physical condition might permit him to do clerical or other work not requiring physical exertion, and in argument counsel contends that the evidence fails to exclude such a possibility. The answer to this contention rests in the evidence. The plaintiff was fifty-four years old when he was discharged. He had spent his entire adult life (except for less than four months) working in or about the mines—none of it in a clerical capacity. It was open to question whether, at his age and with his background, he could adapt himself to clerical or any other work differing from that which he knew to an extent enabling him to earn a reasonable livelihood. It was also open to question as to whether any such work was available or whether anyone would have been willing to give him employment in view of the testimony that he was unable to engage in any activity without interrupting it throughout the day for periods of rest.

There is substantial authority (although not unanimous) for the view that in the case of group insurance covering persons engaged in a particular occupation language which restricts its benefits to inability "to engage in any occupation or employment for wage or profit" is to be construed as referring to the insured's accustomed occupation—the occupation in which he has learned to earn his living.

The case of Gresham v. Aetna Life Ins. Co., 159 S.C. 326, 156 S.E. 878, 879, involved a group insurance policy using the identical language of the policy before us. An instruction to the jury said in part:

> "It (total disability) doesn't mean, now, that he must be entirely disabled from performing anything; it means that he must not be able to perform—that he will not be able to perform those things he is trained for—his customary duty * * *."

In approving this instruction the appellate court referred to a previous decision by it, McCutchen v. Pacific Mut. Life Ins. Co., 153 S.C. 401, 151 S.E. 67, 71, in which the following definition had been laid down:

> "The insured is deemed 'totally disabled' when he is no longer able to do his accustomed task, and such work as he has only been trained to do, and upon which he must depend for a living."

To the same effect is Davis v. Metropolitan Life Ins. Co., 164 S.C. 444, 162 S.E. 429. See also Thomas v. Liberty Life Ins. Co., 131 Kan. 175, 289 P. 414; Aetna Life Ins. Co. of Hartford, Conn. v. Staggs, 255 Ky. 638, 75 S.W.2d 214; both involving coal miners; Metropolitan Life Ins. Co. v. Lambert, 157 Miss. 759, 128 So. 750; Ozark Mutual, etc. v. Winchester, 116 Okl. 116, 243 P. 735; Foglesong v. Modern Brotherhood, 121 Mo. App. 548, 97 S.W. 240.

The interpretation adopted in the cited cases has been adopted most frequently, though not exclusively, in cases involving group insurance where, as here, the policy covered employees engaged in a particular occupation during the period of their employment. We express no

opinion as to whether this is a proper construction of the disability clause in the instant case and are not called on at this time to do so.

All we are now holding is that the testimony presented by the plaintiff raises questions which should be submitted to a jury under proper instructions based upon the law as approved and applied by the appropriate decisions of the West Virginia courts.

Reversed and remanded.