**Joel W. CUNNINGHAM, Plaintiff,**

**v.**

**METROPOLITAN LIFE INSURANCE COMPANY, a corporation, Defendant.**

**Civ. A. No. 2410.**

United States District Court
S. D. West Virginia,
Huntington Division.

Jan. 13, 1969.

Baer, Napier & Hamlin, Huntington, W. Va., for plaintiff.

R. Kemp Morton, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, W. Va., for defendant.

CHRISTIE, District Judge:

This case concerns the right of the plaintiff to recover disability benefits under a group policy of insurance issued by Metropolitan Life Insurance Company to the employees of Union Carbide.

The case was tried before the Court and submitted for decision upon the evidence taken before the Court and the depositions of Dr. Walter C. Swann, taken on June 25, 1968 and Joel W. Cunningham, taken on June 7, 1968, medical reports of Dr. Rowland Burns, dated 1–13–67 and 7–29–68, and medical report of the Cleveland Clinic, dated 8–19–68, as stipulated by the parties.

### STATEMENT OF THE CASE

The plaintiff, a former employee of Union Carbide, contends that before attaining the age of sixty years and while in the employ of Union Carbide, he became totally and permanently disabled by reason of sickness on or about June 15, 1966, entitling him to receive the weekly and monthly benefits as provided for in the policy. The defendant insurance company defends on the grounds that the policy provisions were not complied with regarding notice as to total temporary disability and that the proof fails to establish total and permanent disability.

The plaintiff first began working for Union Carbide at its South Charleston, West Virginia plant in 1957, having been transferred there from Leech, Kentucky, where he had been engaged in work for the same company as a carpenter and carpenter foreman. At South Charleston his work first involved testing and inspecting equipment and next as a fore-man in the power house. His last working day in this position was June 15, 1966, however, being a salaried employee, he was carried on the payroll through October 31, 1966. His employment relationship with Union Carbide was finally terminated effective as of January 31, 1967.

Plaintiff not having reported for work since June 15, 1966, Robert Barnhill, Union Carbide's Staff Supervisor for Industrial Relations, was sent to plaintiff's home in Huntington in September 1966 to see what was wrong. On this visit, plaintiff told Barnhill that he had not returned to work because of illness and he indicated a desire to apply for benefits under the policy. Barnhill, after explaining the provisions of the group policy relating to sick and accident benefits, left with the plaintiff the necessary forms on which to submit claim. The form for weekly (total temporary) benefits was returned to Union Carbide on October 3, 1966, and the form for monthly (total and permanent) benefits was returned to Union Carbide on October 7, 1966. These were the only claims submitted and they were forwarded to the insurance company.

On his visit to plaintiff's home, Barnhill's suspicions were aroused by his observations of plaintiff's physical appearance as to whether he was actually ill. As a consequence, in later submitting the claim forms to the insurance company, he accompanied them with a letter suggesting an investigation. Both claims were ultimately rejected on February 2, 1967, the one for total temporary benefits because of lack of timely notice and the one for total and permanent because of lack of proof to establish the claim.

The policy provision relating to total temporary disability provides for payment of weekly benefits for total temporary disability for sickness commencing three days after such disability begins and continuing for not more than twenty-six weeks, provided written notice thereof is furnished the company within twenty days after the commence-

ment of the disability resulting from sickness. The policy provision relating to total and permanent disability provides for sixty monthly benefits,

"If the Employee, while insured under the Group Policy and prior to his sixtieth birthday, becomes totally and permanently disabled as a result of bodily injury or disease, so as to be prevented thereby from engaging in any and every business or occupation and from performing any work for compensation or profit * * *."

## RÉSUMÉ OF MEDICAL EVIDENCE

Subsequent to leaving work on June 15, 1966, plaintiff went to see Dr. L. E. Christian on June 20, 1966, complaining of headaches and the doctor prescribed medication which reduced his blood pressure. After four or five visits, the doctor recommended that he return to work.

Mr. Cunningham had been seen by Dr. Swann on April 22, 1960, who prescribed medication to reduce his blood pressure and on April 29, 1960, his blood pressure had returned to normal. When he returned to Dr. Swann on August 1, 1966, complaining of shortness of breath and chest pain, the doctor was able to control his blood pressure with medication. Dr. Swann concluded that Cunningham's symptoms were all suggestive of coronary insufficiency. On August 1, 1966, the doctor was of the opinion that Cunningham's vital capacity for an individual his size was normal, no definite findings with respect to the eye grounds, no history of myocardial infarction, irregular heart action, which cleared upon exercise, and suggested heart enlargement by actual measurement. Dr. Swann's diagnosis on August 1, 1966, was coronary insufficiency and angina pectoris. Dr. Swann was of the opinion that patients with angina, hypertension and severe coronaries are capable of working, that the modern concept of treatment of heart disease is to increase the patient's activity. In a written report to Union Carbide, he concluded that the exercise test administered to Cunningham on August 1, 1966, was normal. The important objective findings to substantiate his diagnosis were the measurements of the heart on the X-rays, which are classified as borderline. Dr. Swann was of the opinion that an EKG of March 10, 1967, was not of any significance. He felt that Cunningham could have held a job that did not require stepclimbing, that he was able to work and that, in his opinion, not until August 4, 1967, when he experienced shortness of breath on sitting, did he consider Cunningham to be totally and permanently disabled.

Dr. Walter Yates first saw Cunningham on March 9, 1967, at St. Mary's Hospital, where he was admitted with a bleeding peptic ulcer. After receiving several blood transfusions, the gastrointestinal bleeding ceased and he was released from the hospital on March 19, 1967. Dr. Yates compared three electrocardiograms taken at St. Mary's Hospital in March of 1967, and stated that if the changes between the first EKG, dated March 10, 1967, while Cunningham was in shock from loss of blood, and the last one on March 16, 1967, had been between a resting EKG and one after a master exercise test, the examiner would be obliged to make a diagnosis of coronary insufficiency. Dr. Yates considered the hemorrhaging to be a stress test, the equivalent of a master's exercise test, but he felt that accidentally he had gotten information to substantiate his diagnosis.

Dr. Yates admitted having no personal knowledge of Cunningham's condition prior to March 9, 1967, that generally his blood pressure in the hospital was low, that substituting hemorrhage for a stress test was not a widely accepted diagnostic procedure; he admitted that present diagnostic methods are not diagnostic within a reasonable degree of medical certainty of coronary artery disease, that the EKG changes cannot be taken as proof of the presence of angina in a patient, that during Cunningham's hospitalization at St. Mary's no drugs for the treatment of cardiac disease were

ordered. Dr. Yates felt that in Cunningham's case some of the various tests were only suggestive and not diagnostic, that the history given on two occasions was suggestive of anginal pain, and the EKG findings of St. Mary's were suggestive of coronary insufficiency. He found sufficient coronary insufficiency in March of 1967 to speculate that Cunningham was unable to obtain substantial employment in industry and without the EKG of March 16, 1967, which he considered to be normal, he would be highly suspicious of a diagnosis of coronary insufficiency.

Dr. Yates examined Cunningham again on July 17, 1968, when the X-ray films of the chest revealed a normal cardiothoracic ratio of 17/34 and the results of the double master's exercise electrocardiogram were equivocal.

Plaintiff's Exhibit No. 3, the report of the Cleveland Clinic, dated August 19, 1968, relating to the findings of the examination of 7–25–68, concluded that plaintiff did not have angina pectoris, that his obesity interfered with his lung function, aggravated by his hypertension and that he had diabetes mellitus. The report stated that the resting EKG was within normal limits, the chest X-ray showed normal heart size, pulmonary function studies showed normal lung capacity and no airway obstruction.

Dr. Burns examined plaintiff on behalf of defendant on 1–11–67 and 7–12–68 and the reports of these examinations were admitted into evidence, by stipulation, as Defendant's Exhibits 4 and 5. Dr. Burns initially found no evidence of organic heart disease, a normal heart on physical examination and a normal heart on EKG examinations, before and after exercise. The doctor further stated that there was no essential change in plaintiff's cardiovascular picture at the time of his second examination, no change in the EKG readings and tracings or heart size and on the second examination he concluded that there is "no objective demonstrable evidence of organic heart disease" and that "there is no demonstrable evidence upon which

this examiner may present objective evidence to substantiate a conclusion that this man suffers from sufficient disease to produce total and permanent disability." However, in the second examination, Dr. Burns did note suggested diabetes which was the first detection of elevated blood sugar. Dr. Burns felt that plaintiff's obesity was a consequence of his overeating and not as a consequence of a disease or glandular condition and that his condition would return to normal if he lost 95 pounds. He further stated that two normal EKG's in July of 1968 reaffirmed his conclusion that the plaintiff does not have demonstrable evidence of organic heart disease.

## FINDINGS OF FACT

The Court finds the facts as follows:

1. That the plaintiff ceased work because of alleged illness on June 15, 1966 and first consulted a doctor in regard thereto on June 20, 1966.

2. That the plaintiff, though offered work, elected to not thereafter return to work, assigning disability as the reason.

3. That the employer-employee relationship between Union Carbide and plaintiff was officially terminated effective as of January 31, 1967.

4. That plaintiff's claim forms for both total temporary and total and permanent disability benefits are dated September 27, 1966, and the time of onset or beginning of such disability is fixed therein as June 17, 1966. These claim forms were received at the office of Union Carbide on October 3 and 7, 1966, respectively. There is no satisfactory showing by the plaintiff as to why notice of his claimed disability was not given earlier, in compliance with the 20-day requirement of the policy for total temporary benefits, or that the giving of such notice was waived by either Union Carbide or the defendant insurance company.

5. That the evidence fails to support the plaintiff's claim that, while in the employ of Union Carbide and while

insured under the group policy involved, he became totally and permanently disabled as a result of bodily injury or disease, so as to be prevented thereby from engaging in every business or occupation and from performing any work for compensation or profit, within the meaning of the policy provisions relating to total and permanent benefits.

## CONCLUSIONS OF LAW

The Court states the following conclusions of law:

1. This Court has jurisdiction of the parties and of the subject-matter, and this being a diversity case West Virginia substantive law applies. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

2. The group policy of insurance in this case is a contract which is binding upon the plaintiff, defendant and Union Carbide alike. Watts v. Equitable Life Assurance Society, 125 W.Va. 209, 23 S.E.2d 923; Adkins v. Aetna Life Ins. Co., 130 W.Va. 362, 43 S.E.2d 372.

3. The policy provisions, providing for (a) written notice of claim for total temporary disability benefits within twenty days of the accident or commencement of the disability resulting from sickness, (b) coverage termination upon the termination of employment, and (c) defining total and permanent disability are clear and not ambiguous and must be applied in accordance with the plain meaning of the contract. Iannarelli v. Kansas City Life Insurance Company, 114 W.Va. 88, 171 S.E. 748; DaCorte v. New York Life Insurance Co., 114 W.Va. 172, 171 S.E. 248; Haddad v. John Hancock Mutual Life Ins. Company, 117 W.Va. 749, 188 S.E. 131.

4. In order for an employee to keep in force the insurance provided for him by a group policy, it is essential that he continue his employment with the employer named in the group policy. Adkins v. Aetna Life Ins. Co., supra.

5. Since plaintiff's employment was terminated on January 31, 1967, he was no longer insured under the group policy, except as to a condition existing at or prior to such termination. Adkins v. Aetna Life Ins. Co., supra; John Hancock Mutual Ins. Co. of Boston v. Bennett (W.Va.) 255 F.2d 745 (4th Cir. 1958).

6. Since written notice of claim for total temporary benefits was a condition precedent and such notice was not given by the plaintiff within twenty days after the commencement of his disability and no showing having been made by him of any inability to give such notice within the required period or any circumstances constituting waiver thereof by the defendant, the plaintiff, under such circumstances, cannot recover any sum on his claim for total temporary disability. Neill v. Fidelity Mut. Life Ins. Co., 119 W.Va. 694, 195 S.E. 860; Iannarelli v. Kansas City Life Ins. Co., supra; DaCorte v. New York Life Ins. Co., supra; Antonowick v. Home Life Ins. Co., 116 W.Va. 155, 279 S.E. 601; Jenkins v. New York Life Ins. Co., 122 W.Va. 73, 7 S.E.2d 343.

7. To recover for total and permanent disability, as defined by the group policy, it was incumbent upon the plaintiff to prove by a preponderance of the evidence that, while in the employ of Union Carbide and while the group policy was in force, he became totally and permanently disabled, in a practical sense, as a result of bodily injury or disease so as to be prevented thereby from engaging, in a practical and useful manner, in any work for compensation or profit, Hays v. Prudential Ins. Co., 114 W.Va. 323, 171 S.E. 824; Neill v. Fidelity Mut. Life Ins. Co., supra; Blackburn v. John Hancock Mutual Life Ins. Co., 264 F.2d 840 (4th Cir. 1959), and further, that such disability, in all reasonable probability, will continue for a long and indefinite period of time, Rubenstein v. Metropolitan Life Ins. Co., 118 W.Va. 367, 190 S.E. 531 at 536; Blackburn v. John Hancock Mutual Life Ins. Co., supra, and the evidence failing to establish these requisites, the plaintiff cannot recover any sum on his claim in this action for total and permanent disability.

Judgment for the Defendant.